**Marnick C. NARAINE, Appellant,**

v.

**WESTERN ELECTRIC COMPANY, INC., Appellee.**

**No. 74–1498.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1974.

Decided Dec. 18, 1974.

Benjamin M. Wall, Omaha, Neb., for appellant.

Hird Stryker, Omaha, Neb., for appellee.

Before CLARK, Associate Justice,* STEPHENSON, Circuit Judge, and MEREDITH, District Judge.**

PER CURIAM.

This is an appeal from a bench decision dismissing appellant's claims of ra-

cial discrimination in his promotion, granting of home sick leave, and discharge under 42 U.S.C. §§ 1981 and 2000e–5. From the record, the background of the dispute between appellant and his employer follows.

*Training.*

Naraine, a dark-skinned East Indian Hindu, was born in Guyana, South America, emigrated to the United States, and in June, 1959 was granted a B.S. degree in Natural Sciences from Midland College, where his grades were slightly below a straight "B" average. He also studied for one year in graduate courses at the University of Nebraska.

*Naraine's Work Record.*

His work record included six months at Aaron Ferer and Sons as a part-time [1] laboratory assistant, conducting routine lead analysis; full-time attendant at the Douglas County Hospital for some five months; six weeks at Warren Douglas Chemical Company as supervisory trainee [2]; and, finally, some seven years with Western Electric beginning in August, 1961, as a floor cleaner in its Omaha works. Fearing that Western Electric would not hire him in this position if he revealed his college degree, he represented to the Company that he had 2½ years of college training. This prompted an inquiry by the Company as to whether he understood that the job of cleaner primarily involved the cleaning of floors. He indicated that he understood what the task involved but said he was in need of work so badly that he was ready to accept any position and it was the only job available. He remained in the cleaner position until December 17, 1962, when he became a forklift operator with Western Electric for six months. He was unhappy in both positions; his attendance record was poor in the cleaner

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

** Chief Judge James H. Meredith, United States District Court for the Eastern District of Missouri, sitting by designation.

1. His student visa status prohibited full-time employment, but in January, 1961, he married a United States citizen which changed his immigration status permitting full-time employment.

2. He resigned because he had not been made supervisor within six weeks which he testified he felt was "long enough" to learn the business.

position as was his attitude and initiative. In the spring of 1962, Naraine advised Western Electric of his true educational background, and his name was submitted in September for a position as a Chemical Laboratory Assistant, Grade 206, but his prior poor attendance record prevented his selection. He improved his attendance record and in May, 1963, another opening occurred in the Western Electric Laboratory, and Naraine was selected to fill the position after the Company had sent two of its Supervisors to interview the Dean of Midland College and its Vice President. He began work in the Laboratory at a 206 grade, was promoted to Grade 208 in less than nine months and to the salaried position of Engineering Associate (Grade 210) on July 1, 1965. He remained in this non-professional engineering level position until discharged on June 21, 1968.

There were some 75 to 100 Engineering Associates at the Omaha Works of Western Electric during the period Naraine was in that category. The Western Electric Guide for Promoting Engineering Associates to the Professional Engineering Level sets out two requirements: (1) outstanding performance as an Engineering Associate; and (2) demonstrated ability to perform a wide range of professional engineering assignments.

*The Discharge.*

The discharge came about soon after Naraine had an automobile accident (May 30, 1968) and a subsequent flareup of an ulcer which had been bothering him since 1965. On June 17, 1968, he went to see the company physician to relate to him the recommendation of his private physician that Naraine take two weeks off to return to his former home in Guyana. But the Company physician could not agree. He advised against the trip, believing that Naraine should stay where his doctor was located so the latter could keep him under observation

and treatment. Moreover, he advised that he did not think going to Guyana would relieve Naraine's stress.

During the meeting, the Company physician called in Mr. Mulligan, Manager of Western Electric's Benefit Service program, and told him, in Naraine's presence, that the latter had "reached a point of recovery where his return to work was almost eminent [sic]." The Company medical records on Naraine recites that Naraine's doctor understood and felt that Naraine was "fit for work today." Mr. Mulligan then refused Naraine's request. In view, however, of Naraine's insistence that he was not feeling well and wished to stay home for the rest of the week, the Company doctor classified him as "not fit" and scheduled a re-examination four days later.

After this interview, Naraine went to see his supervisor, R. B. Burton, and asked if he could be granted leave without pay. Burton stated that he could not act while Naraine was on sick leave, but only when he was found fit to work and released by the Company doctor. Further, Burton stated that the Company had a heavy backlog at the moment and needed him badly. Without further discussion, Naraine left the plant and took a two-week trip to Guyana, later testifying that he thought he was getting "the run around."

On his return, July 8, Naraine reported to the Company doctor, complaining of headaches and other ulcer symptoms and stated he did not feel able to go to work. However, the Company doctor classified him as "fit" and Naraine reported to Burton, his supervisor, who told him that he was under suspension. Subsequently, he was discharged by the Manager of the Engineering Division at Omaha for taking the unauthorized absence, an act which was thought to reflect appellant's irresponsibility and, in light of his generally low job performance record, his unfitness for professional duties.[3]

3. Subsequent to his discharge, Naraine went into the restaurant business for himself and has been very successful. At oral argument, counsel indicated that if successful in this case, Naraine would turn the restaurant over to his wife.

*Naraine's Claims.*

Three issues are raised by Naraine. He contends, first, that Western Electric did not articulate a legitimate non-discriminatory reason for failing to promote him by citing (a) his absentee record while employed as a cleaner of floors and toilet bowls; (b) his poor performance evaluations that carried over the results of both Naraine's initial employment as a cleaner and Western Electric's previous discrimination against him; and (c) its alleged inability to physically examine and care for him during his two-week sick leave at home when a majority of its white employees are recruited from an area that permits them to take leave at home and still be available for physical examination.

Second, he argues that while Western Electric's ground for discharging him was his failure to report for physical examination and for taking off two weeks without permission, the normal penalty for such conduct is not discharge but is only loss of sick benefits. Further, he argues that the court's finding of non-discrimination by race or color ignored evidence that Western Electric's percentage of minority employees was less than that of its community (6 percent vs. 10 percent); its percentage of minority technicians and professionals was at best a token (2.3 percent and 2 percent respectively vs. 10 percent); and Naraine was repeatedly passed over or ignored for promotion to which he was qualified, was refused sick leave when white employees were granted the same on like grounds, was denied sick leave recommended by his physician, and was discharged for irresponsible conduct when such a forfeiture had never been suffered by any employee before.

Third, Naraine complains of the refusal of the Court to admit into evidence a letter dated September 10, 1968, from Western Electric to the Defense Supply Agency in which the former dealt with some of its equal opportunity employment problems. Naraine now claims the letter to be an admission against interest.

*Western Electric's Position.*

Western Electric asserted that Naraine met none of the requirements for promotion and that it did not discriminate in the hiring, promotion, or discharge of him. Its proof consisted of the following: (a) low performance ratings attained by Naraine, all of which were known to him and none of which qualified him for promotion to the professional Engineering level, and (b) statistics showing that no more than 2 percent of the Engineering Associates at its Omaha plant attained the rank of Professional Engineer within a three-year period and that it was not unusual for an Engineering Associate to remain so during the rest of his employment with Western Electric. Moreover, the Company asserted that Naraine was irresponsible and had deliberately and consciously defied company orders, thereby exhibiting conduct which was deleterious to the proper conduct of its engineering staff and required the exercise of the ultimate sanction of discharge.

*The Judgment of the District Court.*

■ We have carefully examined the record, the exhibits, the rulings and judgment of the trial judge. We conclude that there are no grounds on which we could say that any of his findings are clearly erroneous. The fallacy in Naraine's reasoning is that he assumes that the burden is on Western Electric to prove non-discrimination. However, the burden is on him to affirmatively prove racial discrimination and this he has failed to do. All of the direct evidence in this regard is against him. From the very inception of his employment as a cleaner he indulged in absenteeism; later he concluded that he had reached a plateau in the "Chem Lab," and became impatient and restless because he felt, incorrectly we think, that as a college graduate his talents were not being fully utilized and his pay was not equal to that of employees having similar education and experience. His parade of some 14 "passovers" is not sustained by the record. Of the 13 specific "passovers"

listed by Naraine in his brief, three were occasioned by his "bad attitude," a problem which the evidence clearly indicates he suffered greatly from; the remainder of the positions open were filled by persons who outranked Naraine in service or seniority or were obviously better educated and had wider experience, such as James Travnacek, who had a B.S. degree from Wisconsin with broad experience as a Laboratory Technician and Chemist. He joined Western Electric in 1966 as an Engineering Associate and was made a Planning Engineer eleven months later. Travnacek was chosen subsequently as one of thirty engineers from a national group of 7000 to attend a two-year program at the Engineering Research Center at Princeton, graduation from which carried a Master's Degree from Lehigh University.

■■ In support of his case, Naraine offered statistical data contrasting the racial makeup of Western Electric's employees with that of the Omaha community. The comparison might suggest that equal employment opportunity was not the prevailing policy of Western Electric. Since such statistics alone have been held sufficient to constitute a prima facie case and to shift the burden of proof to the employer, *see* Reed v. Arlington Hotel Co., 476 F.2d 721, 723 (8th Cir. 1973); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 426 (8th Cir. 1970); *accord*, Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972), we must look to the evidence presented by the company to justify the alleged discriminatory practices. Even assuming that appellant had made out a prima facie case, we conclude here that Western Electric has provided satisfactory explanation for the discharge of Naraine and has therefore rebutted the charges brought by appellant. *Cf.* Heard v. Mueller Company, 464 F.2d 190 (6th Cir. 1972).

■ Nor do we find the court's refusal to admit a letter, marked as Exhibit 4 and dated September 10, 1968, from Western Electric to the Defense Supply Agency reversible error. At trial the letter was offered in evidence without any witness to authenticate it or to lay any foundation or relevancy for its admission. On objection the court refused to admit it. Naraine now claims that it was offered as an admission against interest. Whatever was its purpose, we fail to see its probative value in the light of the entire record and, the trial being without a jury, we find the error, if any, harmless.

■ Finally, Naraine objects to his discharge as being too harsh. On first blush it might appear harsh but a close study of the record supports the discharge. Furthermore, the trial court heard all of the evidence, saw the witnesses and is, we believe, the best judge of the relief that is appropriate. The judgment is, therefore, affirmed.