Richard E. RIGGIN, Plaintiff-Appellant,

v.

BOARD OF TRUSTEES OF BALL STATE UNIVERSITY, and Robert P. Bell, As President of Ball State University, Defendants-Appellees,

and

Richard E. RIGGIN, Appellant,

v.

BOARD OF TRUSTEES OF BALL STATE UNIVERSITY, Dr. R. Thomas Wright, Dr. Thomas Mertens, Dr. Paul W. Parkison, Dr. Marvin R. Gray, and Dr. John P. Strouse, as members of the Hearing Committee of the University Senate Judicial Committee; and Robert P. Bell, as President of Ball State University, Appellees.

No. 1-1084A240.

Court of Appeals of Indiana, First District.

March 3, 1986.

M. Kent Newton, Beth H. Henkel, Bayh, Tabbert & Capehart, Indianapolis, for plaintiff-appellant.

Jon H. Moll, Thomas C. Pence, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, for defendants-appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant, Richard E. Riggin (Riggin), appeals two adverse summary judgments granted in favor of the Board of Trustees of Ball State University (Board of Trustees), and certain members of its personnel. The first case was a suit for injunctive relief seeking enforcement of the Indiana Open Door Law, tried in the Blackford Circuit Court, which was filed against the Board of Trustees, Dr. R. Thomas Wright, Dr. Thomas Mertens, Dr. Paul W. Parkison, Dr. Marvin R. Gray and Dr. John P. Strouse, as members of the Hearing Committee of the University Senate Judicial Committee, and Robert P. Bell, as President of Ball State University. The second case, a suit tried in the Hancock Circuit Court, was in six counts. In this latter case, Riggin brought suit against only the Board of Trustees and Robert P. Bell as President of Ball State University. In his amended complaint Riggin sought: (1) judicial review and injunctive relief to prevent Ball State from terminating his employment as a tenured professor; (2) damages under the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983; (3) damages for breach of contract; (4) damages for defamation; and (5) a declaration voiding the termination proceedings for violation of the Open Door Law. Both cases are consolidated here on appeal.

## STATEMENT OF THE FACTS

Riggin was a tenured professor at Ball State University (Ball State) with 22 years seniority. His performance came under scrutiny by the Dean of the Business School, wherein Riggin taught, which ultimately led to formal specifications for removal being filed against him. The specifications were as follows:

"The charges supporting the conclusion that Dr. Richard E. Riggin is unfit to continue in his position as a faculty member at Ball State University are as follows:

1. Dr. Riggin is an ineffective teacher, in that he:

   (a) Spends an excessive amount of time on nonpertinent matters;

   (b) Fails to cover the basic course materials which students are expected to learn from his classes, as described in the catalog or course syllabi; and

   (c) Demonstrates lack of adequate preparation and lack of organization in lectures.

2. Dr. Riggin has frequently failed to meet classes as scheduled, at the prescribed hour or for the prescibed length of time.

3. Dr. Riggin does not observe regular office hours, in violation of the published College of Business policy that faculty members are to have a minimum of ten (10) hours per week of scheduled office hours.

4. Dr. Riggin fails to carry out his responsibilities with respect to:

   (a) Cooperating with faculty colleagues on matters such as teaching assignments and class scheduling;

   (b) Responding in an appropriate and timely fashion to communications from within his Department and College;

   (c) Participating in departmental, collegiate and university affairs; [and]

   (d) Engaging in research and scholarly activities.

5. Dr. Riggin has been informed repeatedly of these problems and has refused to take corrective steps, and, subsequently, has even refused to discuss them with the Department Head and/or Dean."

After exhausting all preliminary procedures, after a hearing before an ad hoc hearing committee which recommended his discharge, and after a review of that hearing by the Board of Trustees, Riggin's

employment was terminated. His suits challenge that decision. Further record and evidence will be recited at appropriate places in the opinion.

## ISSUES

Riggin raises the following nine issues on appeal:

    I.   Whether the Indiana Open Door Law applied to the hearing committee's proceedings.

    II.  Whether the judgment is supported by substantial evidence.

    III. Whether the determination to separate Riggin was based on lawful or acertainable standards.

    IV. Whether the dismissal violates Riggin's equal protection rights.

    V.  Whether the dismissal violated Riggin's First Amendment Rights.

    VI. Whether Riggin established all the requisites for and then was entitled to injunctive relief.

    VII. Whether Riggin's notices of claim were legally sufficient under the Indiana Tort Claims Act.

    VIII. Whether the Ball State officials involved are immune from liability under the Indiana Tort Claims Act.

    IX. Whether the Board of Trustees and the President of Ball State are immune from liability under the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983.

## DISCUSSION AND DECISION

Both cases were decided by summary judgment. Summary judgment is the proper vehicle for dispute resolution where:

"The pleadings, depositions, answer to the interrogatories, and admission on file, together with affidavits and testimony, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Ind.Rules of Procedure, Trial Rule 56(C). This standard is applied whether the issue of summary judgment appropriateness is raised at trial or upon appeal. *Richardson v. Citizens Gas & Coke Utility* (1981), Ind. App., 422 N.E.2d 704. Since neither Riggin nor the Board of Trustees dispute the facts, summary judgment is an appropriate vehicle to resolve the dispute.

Issue I: *Open Door Law.*

Ball State concedes that it is a public agency as defined by IND.CODE 5–14–1.5–2(a); that its Board of Trustees is a governing body within the meaning of that term as used in IND.CODE 5–14–1.5–2(b), and that its Board of Trustees is subject to the Indiana Open Door Law. It denies, however, that the ad hoc hearing committee is subject to that Act.

The ad hoc hearing committee derives its authority in the following manner: Ball State is controlled by the Board of Trustees. IND.CODE 20–12–57.5–1; IND. CODE 20–12–57.5–2; IND.CODE 20–12–57.5–11. That body adopted a constitution which established the University Senate, which is empowered to advise the Board of Trustees on the appointment, promotion, tenure and dismissal of faculty members. An elaborate system of committees was created by the senate to aid in the governing of Ball State, which includes the disciplining faculty members. In matters of discipline and/or removal of faculty members, an informal preliminary proceeding is first held in an attempt to resolve the problem. If unsuccessful, the matter is referred by the dean of the affected college to the Professional Policies Council of the senate for further informal review. If the Professional Policies Council review does not resolve the matter, it is referred to the President of Ball State. Thereupon, the president presents the affected faculty member with written specifications and informs him of his right to a hearing before a five person ad hoc committee selected by the president of the senate from members

of the Ball State Senate Judicial Committee, a standing committee elected by the senate. The ad hoc hearing committee determines its own procedure, consults previously collected information, and, in consultation with the president, determines whether the hearing shall be public or private. A hearing is held and a record of its proceedings is kept. After the committee arrives at its decision by explicit findings and a majority vote, it notifies the president and the affected faculty member. The Board of Trustees is then informed of the committee's recommendations. Article IV provides:

> "Consideration by the Board of Trustees: The President should inform the Board of Trustees of the recommendation of the Hearing Committee and should make a copy of the record available to it. *The Board has the prerogative of reviewing the case, if it so desires.* If a review is held, it is recommended that the Board's action be based on the record of the previous hearing and that opportunity be extended to both principals to present arguments and evidence in their behalf. Either the decision of the Hearing Committee should be sustained or the proceedings should be returned to the Hearing Committee with objections specified. In the latter case, the Committee should be accorded the privilege of reconsidering its actions; in doing so, the Hearing Committee should take account of the stated objections of the Board and should receive new evidence and hear new argument, if necessary. If, as a result of the second hearing, the Hearing Committee returns the same recommendation to the Board and if the Board still cannot sustain the recommendation of the Hearing Committee, the Board should then overrule the Hearing Committee and render its decision." (Our emphasis.)

The committee in Riggin's case opted to have a closed hearing even though Riggin demanded an open one. Riggin thereupon filed his suit to force an open hearing under IND.CODE 5–14–1.5–1 *et seq.*, the Open Door Law.

In its conclusions of law relative to the Open Door Law, the trial court held:

> "That the plaintiff does meet the requirements of the Indiana Open Door Law with the exception of the fact that the governing body, the Ball State University Board of Trustees, did not appoint the Hearing Committee nor delegate authority to said Committee.
>
> That the recommendations of the Hearing Committee are not binding upon the governing body, the Ball State University Board of Trustees.
>
> \* \* \* \* \* \*
>
> That the Indiana Open Door Law is inapplicable because of the way in which the Hearing Committee was formed."

In spite of its conclusions of law, the trial court stated that Riggin should have an open hearing as a matter of principle. It said:

> "Furthermore, private hearings that affect public business foster suspicions that are usually unfounded and could be avoided by public hearings. Also, the nature of the allegations and charges that have been filed against Dr. Riggin are not such that they should cause undue embarrassment to witnesses that testify at the hearing.
>
> Although the Court has determined that a public hearing cannot be forced upon the Hearing Committee pursuant to the provisions of the Indiana Open Door Law, the Court would encourage the Hearing Committee to reconsider their decision to refuse to grant Dr. Riggin's request for a public hearing."

Thereafter, at a hearing on a motion to stay under Ind.Rules of Procedure, Trial Rule 62(C), the trial court denied the motion on condition that Ball State provide an open hearing. Although the hearing was open, other requirements of the Open Door Law concerning notice, etc., were not met.

The Indiana Open Door Law is sweeping and all inclusive in its provisions. IND. CODE 5–14–1.5–1 provides in part:

> "*It is the intent of this chapter that the deliberations and actions of public agencies be conducted and taken open-*

*ly, unless otherwise expressly provided by statute,* in order that the citizens may be fully informed. The purposes of this chapter are hereby declared to be remedial, and *its provisions are to be liberally construed* with the view of carrying out its policy." (Our emphasis.)

IND.CODE 5–14–1.5–2 furnishes definitions and, as relevant here, they are as follows:

"For the purposes of this chapter:

(a) *'Public agency'* means:

(1) any board, commission, department, agency or authority, by whatever name designated, exercising a portion of the executive, administrative or legislative power of the state;

\* \* \* \* \* \*

(b) *'Governing body'* means the board, commission, council, or *other body* of a public agency which takes *official action* upon *public business* and includes *any committee* appointed by the governing body or its presiding officer to which authority to take official action upon public business has been delegated.

\* \* \* \* \* \*

(d) *'Official action'* means:

(1) *To receive information or to deliberate on public business;*

(2) To make recommendations pursuant to statute, ordinance, or executive order;

(3) To establish policy;

(4) To make decisions on public business; or

(5) To take final action.

(e) *'Public business' means the function for which the public agency is created.*

\* \* \* \* \* \*

(i) *'Deliberate'* means a discussion which may reasonably be expected to result in official action defined under section 2(d)(2), (3), (4) or (5) of this chapter [subsection (d)(2), (3), (4) or (5) of this section]." (Our emphasis.)

All meetings of governing bodies of public agencies must be open to the public, IND.CODE 5–14–1.5–3, except executive sessions. IND.CODE 5–14–1.5–6. Public notice of the meetings must be given at least 48 hours prior thereto. IND.CODE 5–14–1.5–5. An agenda must be posted prior to the meetings. A memorandum of the meetings' general substance must be kept and made available to the public. IND.CODE 5–14–1.5–4. IND.CODE 5–14–1.5–7 provides in part:

"(a) An action may be filed by any citizen of this state in any court of competent jurisdiction *to enjoin continuing,* threatened or future violations of this chapter, *or to declare void any action taken at an executive session in violation of section 3(a) of this chapter or at any meeting of which notice is not given in accordance with section 5 of this chapter.* The plaintiff in such suit need not allege or prove special damage different from that suffered by the public at large." (Our emphasis.)

Conceding that it is a public agency, Ball State's principal argument is, as stated by the trial court, that since the Board of Trustees did not appoint the ad hoc committee under Ind.CODE 5–14–1.5–2(b), the committee is not within the definition of "governing body" and thus not subject to the Open Door Law.

"Governing body" under the above definition (b) "includes any committee appointed by the governing body ... to which authority to take official action upon public business has been delegated." "Official action" under definition (d) means: "(1) to receive information or to deliberate upon public business." Since (d)(1), (2), (3), (4) and (5) are stated in the disjunctive, each subparagraph separately can be official action. Under definition (e) "public business" means the function for which the public agency was created. Clearly, it is a function of Ball State to employ and discharge professors.

We also refer to IND.CODE 5–14–1.5–1 which states that the actions of a public agency are to be taken openly "unless oth-

erwise expressly provided by statute." Such ad hoc committees are not expressly excluded.

■ We reject Ball State's argument that because its Board of Trustees did not appoint the ad hoc committee, it was not a "committee appointed by the governing body." It is our opinion that Ball State may not do indirectly what it can not do directly. Ball State cannot escape the operation of the Open Door Law simply by appointing a committee which appoints a committee, which appoints the committee which conducts the hearing. Such is merely a vehicle for subterfuge.

We further reject the argument that since Riggin was afforded a review by the Board of Trustees, the ad hoc committee's action was not subject to the Open Door Law. First, as shown above, the right of review was discretionary. Additionally, though the Trustees stated that they had read the 16-volume, 3,567 page transcript, such a review would not have informed interested spectators at the hearing. The very purpose of the Open Door Law is to prevent secret hearings and "Star Chamber" proceedings which shield the nature of testimony, the identity of witnesses and issues, and becloud the attitude of the triers.

We also reject Ball State's argument that a decision subjecting faculty committees to the Open Door Law would work as a massive expansion of the Act. Ball State points out that literally hundreds of departments, committees, subcommittees and boards now existing at Ball State and other state universities would be covered. It is our view that the Act is massive and all inclusive by itself, and needs no expansion by us. While we may have sympathy for Ball State, and for amicus curae Indiana State University, and though we may even agree that the law is too broad, cumbersome and unwieldy, and that it imposes time consuming and expensive labors on persons who effect decisions on trivial matters of little public interest, our function is not to judge the wisdom of the Act, but

only its meaning. Ball State's argument should be addressed to the legislature.

We have examined widely varying statutes from other jurisdiction and cases decided under them. However, we find them of little help. The Indiana Open Door Act is the broadest and most sweeping we have found, containing provisions, such as the inclusion of committees, not readily found elsewhere. Consequently, the judicial interpretations are as divergent as the statutes.

■ We hold that the Open Door Law applies to the ad hoc committee. However, since we believe that Ball State substantially complied with the Act, such a holding does not demand a reversal on the facts of this case.

The proceedings at issue involve a private contractual matter between Riggin and Ball State which had only a secondary interest to the general public. The contractual provisions included the regulations of the University as set forth in the Faculty Handbook. Those regulations stated that disciplinary proceedings could be closed. While an argument can be made that a person may contract away statutorily granted rights, we need not address that issue for, due to the coercion of the Blackford Circuit Court, an open hearing was held. There is no suggestion that access to the hearing by interested spectators was impeded or restricted in any manner. It is significant that the drafters of IND.CODE 5–14–3–6(a) evidently did not disfavor closed hearings for matters involving employee misconduct, as a matter of general policy, since an executive session for such a purpose is permitted by that section. There is likewise no suggestion that Riggin was prejudiced by the manner in which the hearing was conducted.

Though not provided as a matter of right, Riggin, following the decision and report made by the ad hoc committee, was in fact afforded a full review of his case by the Board of Trustees. The individual trustees stated that they had read the transcript. That review hearing complied with the Open Door Law. Riggin, appearing in

person and by counsel and, without restriction, presented what he wished to present. Clearly there has been no prejudice to Riggin in the presentation of the merits of his case, and in fact, he claims none. His argument is merely technical in that his complaint regards the lack of public notice and the failure to post an agenda prior to the ad hoc committee hearing.

Authorities exist supporting the view that where there is a hierarchial system of administrative hearings and administrative appeals, a party may appeal only from the decision of the highest body in the hierarchy. He may not leap back over that decision and litigate a matter occurring at the lower levels of the hierarchy which may have been corrected at the highest level. Should this be permitted, administrative appeals wherein mistakes are corrected would be rendered useless. *Terre Haute Regional Hospital, Inc. v. El-Issa* (1984), Ind.App., 470 N.E.2d 1371, *trans. denied.* *See also* concurring opinion in *Kennedy v. St. Joseph Memorial Hospital* (1985), Ind.App., 482 N.E.2d 268.

The clear policy of the Open Door Law as stated in IND.CODE 5–14–1.5–1 is "that the deliberation and actions of public agencies be conducted and taken openly...." We hold that there has been substantial compliance with that Act. This result has support from other jurisdictions. *Arnold Transit Co. v. City of Mackinac Island* (1980), 99 Mich.App. 266, 297 N.W.2d 904, *aff'd.* (1982), 415 Mich. 362, 329 N.W.2d 712, *cert. denied* (1983), 464 U.S. 1064, 104 S.Ct. 746, 79 L.Ed.2d 204; *City of Flagstaff v. Bleeker* (1979), 123 Ariz. 436, 600 P.2d 49; *Karol v. Board of Trustees* (1979), 122 Ariz. 95, 593 P.2d 649; *Ohio Committee Of the Central Station Electrical Protection Association* (1977), 50 Ohio St.2d 169, 364 N.E.2d 3; *Stelzer v. Huddleston* (Tex.Civ.App.1975), 526 S.W.2d 710. No good purpose would be served to repeat this expensive litigation.

Issue II: *Sufficiency of the Evidence.*

Riggin first argues here that the trial court erred in its Findings of Fact Number 9 regarding his alleged indiscretions. The record shows that appropriate department heads had, on August 17, 1981, sent a letter to Riggin criticizing his teaching performance in the following respects: (1) spending class time on non-pertinent matters; (2) failing to cover course content; (3) not meeting classes on schedule; (4) unfair grading; (5) failing to observe office hours; (6) being non-cooperative; (7) causing difficulties with respect to schedules and assignments; (8) non-involvement in departmental, collegiate and university activities; and (9) non-participation in research and scholarly pursuits. The court found that each of these concerns had been communicated to Riggin by letters and conferences, including a letter dated July 27, 1977, a conference held on August 3, 1977, and a letter of censure dated June 19, 1978. The court found that the letters contained an invitation to Riggin to respond so that the problem could be resolved. Riggin declined that invitation. The record shows that Riggin did respond to a 1977 letter after which a short conference was held, but Riggin merely characterized that conference as a "lot of bull." The record shows that he failed to respond to all other communications and refused all further efforts to discuss the problem of his professional competency.

In his brief, Riggin merely claims that though he attended some meetings, he was not required by the rules, stated in the Faculty Hand Book, to respond at all.

■ The court's findings are clearly supported by the evidence. We are also of the opinion that whether the Faculty Hand Book said so or not, the University, through its deans and department heads, had every right, and even the duty to monitor Riggin's performance. To that end, he had no right to disregard a summons from his superiors.

Riggin also argues that the court erred in Findings of Fact Number 13 which found that the written statement of charges encompassed the same concerns as set forth in the August 17, 1981 letter. Examination of the documents revealed that the specifications contained the same

matters as the letter except that the grading matter was deleted, and the specification that Riggin failed to take corrective action was added.

Riggin further argues that the trial court erred in Findings of Fact Numbers 20, 27, 29, 30, and Conclusions of Law Number 11, because they were unsupported by and contrary to the evidence. Those findings referred to the fact that the ad hoc committee had issued a report, after the conclusion of its hearing, wherein it found that Riggin was an ineffective teacher; lacked adequate organization in presenting course content; spent an inordinate amount of time on non-pertinent matters; failed to cover the course material; failed to meet classes as scheduled; failed to observe office hours; failed to cooperate with faculty colleagues concerning teaching assignments and class scheduling; failed to respond in an appropriate and timely fashion to department and collegiate communication; failed to engage in research and scholarly activities; and refused to alter his behavior or discuss the problems with his department head or the dean. The committee concluded that:

"Dr. Riggin does not meet even minimum expectations with regard to his professional performance; he does not demonstrate a continuing commitment to his department, college, or Ball State University; he does not place his personal and professional responsibilities in proper priority; and he is unable or unwilling to accept and cope with change. The Committee's finding that Dr. Riggin is an ineffective teacher is most serious, because of the direct harm which ineffective teaching inflicts on students. The committee also believes that several of its other findings—specifically, those relating to his almost total lack of research and university service, and his continuing refusal to cooperate with his faculty colleagues or to communicate with his administrative superiors—are also major shortcomings."

The court further found that Riggin had adequate time to prepare his defense. It found that the committee's findings were supported by the evidence and that Ball State had a rational basis for dismissing him. Thus it held that the University's decision to dismiss him could not be said to have been arbitrary and capricious. Therefore, the court concluded Riggin's dismissal did not breach his employment contract.

■ Riggin correctly argues that a court of review will not interfere with the acts of an administrative agency which are within the agency's allowable scope of responsible discretion unless it found that the administrative act was arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence. *Metropolitan School District of Martinsville v. Mason* (1983), Ind.App., 451 N.E.2d 349, *trans. denied.* The court may not substitute its own opinions for that of the Board of Trustees, but must give deference to its expertise. *Mason, supra.* A court may not reweigh the evidence or determine the credibility of witnesses. *Mason, supra.* The burden of proving that the administrative action was arbitrary and capricious or an abuse of discretion falls on the party attempting to vacate the administrative order. *Mason, supra.* An arbitrary and capricious act is one that is willful and unreasonable and done without regard to the facts and circumstances of the case; an act without some basis which would lead a reasonable and honest person to the same conclusion. *Mason, supra.*

■ The court's review of the decisions of the committee and the Board of Trustees was not a hearing de novo. Rather, its sole function was to determine whether the action was illegal, or arbitrary and capricious. In doing so it must accept the evidence most favorable to support the administrative decision.

Testimony against Riggin was given by department heads, deans, fellow faculty members and former cum laude students. That testimony revealed that problems concerning Riggin's competence surfaced as early as 1977. At that time the dean of his school and the head of his department voiced criticism of Riggin's performance as

a teacher and as a faculty member, and they attempted to effect an improvement in his performance. The deficiencies complained of included lack of preparation; showing too many irrelevant films which consumed about one-third of class time; lack of teaching material or aids (justified by Riggin on the grounds that he had taught so long that he did not need them); a reading list which contained no books published later than 1968 and that had not been updated since 1975; haphazard lectures; lack of diligence in completing course content; and failure to assign problems in a course, finance, that routinely calls for such.

There was evidence that at least some of his students were not prepared to advance in Riggin's particular area of discipline and that some could not meet minimum qualifications for advanced work. He spent an inordinate amount of class time on non-pertinent matters such as telling stories and talking about his dairy business, athletics, his experiences as a legislator, current events, lawsuits in which he had been involved, and the societal influence of bankers. Some witnesses concluded that he spent 50% to 75% of class time on such irrelevant matters.

There was evidence that he was non-cooperative in the area of teaching assignments and class scheduling, yet demanded schedules, without consideration of departmental needs, which gave him large blocks of time in which to pursue personal endeavors. He even changed class scheduling without departmental approval. In at least one instance he refused to teach a class offered by his department.

There was evidence that Riggin failed to adequately participate in departmental, collegiate and university affairs. He attended only five out of the last sixteen Finance Department meetings, and did not participate in those that he did attend. He did not participate in syllabus or curriculum formulation, or in textbook selection. He had not served on any doctoral committees since the early 1970's, and had not been a member of a university committee for 12 years.

There was evidence that he had not engaged in research or scholarly activities for at least 10 years, had not belonged to any professional organizations, and did not attend any academic organization meetings. At one time he belonged to a number of organizations, but had since dropped out.

There was evidence that research, scholarly activities, attendance at some professional organization meetings, participation in departmental and university affairs, and cooperation with fellow faculty members, department heads, and deans were expected of every faculty member including Riggin. Attempts by his superiors to communicate with him over a course of years met with rebuffs. He was belligerent, threatened to bring law suits and demanded that his attorney be present at conferences. He not only refused to alter his behavior, but refused to discuss it, characterizing the activities of his superiors as a "conspiracy." Riggin's argument here is without basis. It is merely an invitation to reweigh the evidence.

Issue III. *Ascertainable Standards.*

Riggin argues here that administrative decisions must be based upon ascertainable standards, and that such standards did not exist in the instant case.

IND.CODE 20–12–1–2(d) provides that Ball State may "... dismiss, suspend, or otherwise punish any ... faculty member ... who violates the institution's rules or standards of conduct, after determining guilt by lawful proceedings." Regulations published in the Faculty Handbook provide that faculty member contracts include an agreement that the faculty member will be bound by the rules and regulations as found in the Faculty Handbook.

The standards of conduct expected of a faculty member are dealt with by the Faculty Handbook in various ways. It states that a teacher is entitled to full academic freedom in research "... subject to adequate performance of other duties"; that a teacher should be careful not to introduce into his lectures controversial matters

which have no relation to the subject; that a teacher, as required by professional ethics, should devote his energy to developing his motivation and improving his scholarly competence, exercise self-discipline and good judgment and practice intellectual honesty; and that a teacher should accept his share of faculty responsibilities for the governing of the institution. In the area of promotion the Faculty Handbook enumerates a number of criteria. The standards include proper class preparation, organization, use of teaching aids and overall administration; comprehensive knowledge of the subject area; outstanding performance and dedication; involvement in advanced studies; professional research and writing culminating in published articles; devotion of time and energy to the academic community by serving on committees; giving special lectures; performing administrative responsibilities; contributing on an interdepartmental level; and joining and participating in professional associations and presenting papers thereto.

*Podgor v. Indiana University* (1978), 178 Ind.App. 245, 381 N.E.2d 1274, *trans. denied,* provides that in order to satisfy substantive due process, an administrative decision must be in accord with previously stated ascertainable standards. "The requirement is to make certain that administrative decisions are fair, orderly, and consistent rather than irrational and arbitrary." *Id.,* 381 N.E.2d at 1283. The standard should be written with sufficient precision to give fair warning as to what the agency will consider in making its decision, and it should be made readily available to those having potential contact with the administrative agency. *Id.*

The Supreme Court of the United States addressed a case wherein a civil service employee was discharged under a standard "for just cause as will promote the efficiency of the service," and held it to be constitutionally sufficient. *Arnett v. Kennedy* (1974), 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15. The term "conduct unbecoming an officer" is not an unconstitutionally vague standard as applied to a police officer who lied to his superior in the course of a theft investigation. *Atkinson v. City of Marion* (1980), Ind.App., 411 N.E.2d 622. In *Atkinson,* the court emphasized that the conduct of lying to a superior officer was such that any reasonable person would recognize it as a ground for dismissal. The disciplinary standard of "frequently repeated acts of incompetence" has been held to be constitutionally sufficient. *Natural Resources Commission v. Sullivan* (1981), Ind.App., 428 N.E.2d 92. In *Sullivan,* the conduct consisted of failure to obey specifications, failure to discharge duties, and promoting disharmony resulting in a severe morale problem. "[W]illful and wanton misconduct" was the disciplinary standard existing in IND.CODE 25–22.4–6–2(6) (*repealed by* Acts 1981, P.L. 222, Sec. 296), the Medical Licensing Act. The court held that such standard was sufficient against a challenge of vagueness when adjudged by a panel of qualified experts in the field. *Medical Licensing Board of Indiana v. Ward* (1983), Ind.App., 449 N.E.2d 1129, *trans. denied.*

Finally, the very rules contained in the Ball State Faculty Handbook came under judicial scrutiny in *Korf v. Ball State University* (7th Cir.1984), 726 F.2d 1222. In that case Korf was discharged for the sexual harassment of male students. The court, referring to the ethics portion of the Faculty Handbook, affirmed the granting of a summary judgment against Korf in his action against Ball State under 42 U.S.C. Sec. 1983. The court said:

> "The plaintiff-appellant has failed to cite any caselaw [sic] setting forth a constitutional requirement that such notice be provided to would-be offenders. Common sense, reason and good judgment should have made him cognizant of the fact that his conduct could and would be cause for termination. One cannot be heard to complain that it is somehow unfair to be the first one disciplined under a particular law, rule or regulation since if that were the case, no new law, rule or regulation could ever be enforced."

*Korf* at 1226–1227.

The court in *Korf* further explained the rationale which has emerged from the cases.

"Dr. Korf further argues that it is significant that the AAUP Statement on Professional Ethics relied upon by the Board of Trustees as the basis for his termination does not make any reference to sexual conduct. While his observation that the statement does not specifically mention sexual conduct is correct, his conclusion regarding the omission's significance is misplaced and is contrary to reason and common sense. As is the case with other laws, codes and regulations governing conduct, it is unreasonable to assume that the drafters of the Statement on Professional Ethics could and must specifically delineate each and every type of conduct (including deviant conduct) constituting a violation. Nor have we been cited any case reciting that the language of the Constitution requires such precision.

'[I]t is not feasible or necessary ... to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include "catchall" clauses prohibiting employee "misconduct," "immorality," or "conduct unbecoming." ' " (Citations omitted.)

*Id.* at 1227.

We first observe that the charges upon which Riggin's dismissal was based were for a material failure to perform the duties for which he was employed. Collectively, they charge that Riggin perfunctorily and superficially met his classes and merely filled in class time without regard to curriculum or educational demands. He was not charged with the violation of a particular rule or a particular act of misconduct. The fundamental question in this case is whether it is possible, or even desirable, to formulate specific standards against which a college professor's fitness or competency, or adequacy to teach his classes is measured.

There is strong evidence in the record that such is not feasible. Even Dr. Chamberlin, Riggin's own witness, stated:

"Well, we are talking about standards of professionals, professionalism, and they are learned across time otherwise you would not be accepted to the professional group with which you are admitted to, and that as you have learned them you practice them. They are not standards that are written, they are not empirically based, they are standards that are assumed and tested across time."

He opined that considerable subjectivity was involved in such a determination. Immorality, insubordination and incompentency, he said, are generally held as a basis for terminating a tenured professor, though they are not specifically defined. Faculty colleagues, he continued, typically make the determination. Dean Black agreed with him that peer groups make the judgment on the performance of a faculty member.

In this instance the Faculty Handbook contains numerous general statements, as recited above, expressing the University's expectations of its faculty members. Riggin contracted these expectations. Viewing the evidence most favorable to the decisions, his conduct fell far short of them. Attempts by his superiors, over a period of four or five years, to avoid the extreme sanction of discharge were met only with sulkiness, rebuffs and hostility. As stated in *Korf, supra*, common sense, reason and good judgment should have told Riggin that such conduct would be a cause for termination.

Issue IV: *Equal Protection.*

Riggin argues that Conclusions of Law Numbers 6 and 7 are contrary to law. The trial court held that since he had not alleged and proven that he was a member of a suspect class, the only inquiry under equal protection is whether the challenged state action rationally furthered a legitimate state purpose or interest, and that Riggin presented no issue by the mere assertion that he was the first tenured faculty member to be separated by Ball State based on inadequacies of performance.

Riggin seemingly argues that because there was a lack of standards, that because

his First Amendment rights were violated, and that because he was the first faculty member to be so terminated by Ball State, the burden devolved upon Ball State to prove a compelling state interest for his removal, and that the court erred in finding that he was required to present evidence of Ball State's refusal to separate other faculty members with similar shortcomings.

■ The record fails to suggest that Ball State would refuse to discharge a professor whose conduct was such as Riggin's, nor does it show that Riggin has ever contended that he was a member of a suspect class, e.g., race, religion or sex. Thus, the only inquiry, as the court found, is whether Ball State's action is rationally related to Ball State's objectives. *See Harrah Independent School District v. Martin* (1979), 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248. Clearly, Ball State's action was rationally related to its responsibility to maintain minimum academic standards. In this case we do not see any evidence of invidious discrimination by Ball State against persons similarly situated. As stated in *Korf, supra,* the mere fact that he was the first to be disciplined is not in and of itself sufficient. We have already written to the issue of standards in Issue III, and First Amendment rights will be discussed in Issue V.

Issue V. *Free Speech.*

The trial court, in Findings of Fact Number 32, found that Riggin had not demonstrated that he was terminated in order to punish him for exercising his constitutional rights of freedom of speech and association, and held in Conclusions of Law Number 10 that he was not so terminated in retaliation therefor.

Riggin correctly argues that a teacher, under the First Amendment, is constitutionally guaranteed a certain amount of academic freedom; that casting "a pall of orthodoxy over a classroom" will not be permitted. *Keyishian v. Board of Regents* (1967), 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629. Riggin continues that once a plaintiff shows that he was engaged in a constitutionally protected activity, and the activity was a substantial reason for his termination, the burden is upon the employer to show that he would have been terminated notwithstanding the activity. As a general abstract principle of law, he is correct. *See Mt. Healthy City School District Board of Education v. Doyle* (1977), 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471.

Riggin then advances the argument that he was an independent thinker who espoused certain conservative views regarding economic theory, and Ball State, by the proceedings in question, attempted to stifle those views.

■ Our examination of the committee record reflects that the First Amendment argument is merely an assertion by Riggin himself. The record overwhelmingly shows that Riggin was separated solely because of his failure to cover basic course material, his expenditure of excessive amounts of class time on non-pertinent matters, his failure to carry out his responsibilities to colleagues and administrators, his failure to correct his shortcomings, and other derelictions of duty.

■ The cases hold that school and university administrators have a right to control curriculum, course content and methods of instruction, and that a teacher has no right to override the wishes and judgment of his superiors and fellow faculty members in that regard. *See Petrie v. Forest Hills School District Board of Education* (1982), 5 Ohio App.3d 115, 449 N.E.2d 786; *Hetrick v. Martin* (6th Cir. 1973), 480 F.2d 705, *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482; *Clark v. Holmes* (7th Cir.1972), 474 F.2d 928, *cert. denied* (1973), 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695; *Stastny v. Board of Trustees of Central Washington University* (1982), 32 Wash.App. 239, 647 P.2d 496, *cert. denied* (1983), 460 U.S. 1071, 103 S.Ct. 1528, 75 L.Ed.2d 950; *Smith v. Kent State University* (6th Cir.1983), 696 F.2d 476; *Jawa v. Fayetteville State University* (E.D.N.C.1976), 426 F.Supp. 218. Academic freedom is not a license for uncon-

trolled expressions at variance with established curriculum content. Academic freedom does not encompass matters inherently destructive of the proper functions of the institution, *Clark, supra.* A college has the right to expect a teacher to follow instructions and to work cooperatively and harmoniously with colleagues and the head of his department. *Jawa, supra.* This rule has been applied to impermissible deviations from teaching standards and methods thought appropriate by superiors, *Hetrick, supra;* to controversial counseling methods and over-emphasis in teaching sex, *Clark, supra;* to teaching techniques, grading techniques and competency, *Jawa, supra;* to inadequate performance, *Roseman v. Indiana University of Pennsylvania, at Indiana* (3rd Cir.1975), 520 F.2d 1364, *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976); to unauthorized leaves of absence, *Stastiny, supra;* to using class time to detail personal expressions and feelings about police, unrelated to the subject for which the class was scheduled, *Petrie, supra;* and to abusive language, false statements, and bickering with fellow faculty members, *Jawa, supra.* A teacher may not use his students, who are dependant upon them for grades and recommendations, as a captive audience and as a forum to make capricious remarks and vent criticisms about other staff members. *Clark, supra; see also Ferguson v. Thomas* (5th Cir.1970), 430 F.2d 852.

Riggin is attempting here to bootstrap a contract case. He has turned a mere case of discipline into one of constitutional proportions. Other than Riggin's bare assertions, there was no evidence before the ad hoc committee that he was discharged because of the exercise of First Amendment rights. The fact that the ad hoc committee and the Board of Trustees did not believe his contention is not evidence of arbitrary and capricious conduct.

Though no Indiana cases have addressed this issue, we agree with the above authorities. We hold that governing bodies of colleges, universities and other schools acting through their deans, department heads, and duly constituted faculty commit-

tees, have a right to develop curriculum, determine course content and impose methods of instruction. A teacher is obligated to comply with their directions in this regard. We hold that a teacher may not use his class, a captive audience, as a forum to disseminate his personal views on matters not connected with the course, wasting the time of the students who have come there and paid money for a different purpose. Should a teacher feel that for the betterment of mankind, he has a mission to utter such unrelated messages, he may hire a hall somewhere, on his own time and at his own expense.

### Issue VI: *Injunction Relief.*

In his amended complaint Riggin prayed for a temporary restraining order, preliminary injunction, and a permanent injunction enjoining Ball State from separating him from his employment. Riggin claims error on the part of the trial court in refusing to grant a preliminary injunction. No error is predicated upon the failure to grant a permanent injunction.

A preliminary injunction is granted at the onset of a legal proceeding for the purpose of maintaining the status quo until the final determination of the principal suit. It expires upon final judgment unless converted into a permanent injunction. *See Swaim v. City of Indianapolis* (1930), 202 Ind. 233, 171 N.E. 871. Therefore, in the instant case, since the trial court issued a final judgment, any question concerning the ruling on a preliminary injunction is moot.

Additionally, the granting of a preliminary injunction rests within the sound discretion of the trial court, and we will not disturb its ruling except upon a clear showing of abuse of discretion. *Indiana Pacers v. Leonard* (1982), Ind.App., 436 N.E.2d 315. No abuse is demonstrated.

### Issues VII, VIII and IX. *Immunity Under The Indiana Tort Claims Act, And The Civil Rights Act of 1871, 42 U.S.C. Sec. 1983.*

In Count VI of his amended complaint, filed December 19, 1983, Riggin charged

defamation by Ball State in bringing the charges it filed November 8, 1982. Notice of the tort claim was not filed until August 18, 1983, which was thereafter amended on November 30, 1983. In Findings of Fact Numbers 24 and 25, and Conclusions of Law Number 12, the court found that the notices were inadequate, and that Ball State and its employees possessed immunity under IND.CODE 34–4–16.5–3(5) and (6). Under Issue VII Riggin argues substantial compliance with the notice provisions of the Tort Claims Act, and in Issue IX he argues that the lack of good faith abrogates immunity. Since Issue IX, which we decide adversely to Riggin, is wholly dispositive of the defamation matter, we will address only that issue, though we agree that the notices were probably inadequate.

Riggin claims that implicit in his amended complaint is a Section 1983 action, though the pleading does not designate it as such. Such action apparently is stated in Count IV wherein he charges that the action of Ball State violated the First Amendment to the United States Constitution in that the action was intended to and did in fact, punish Riggin for the exercise of his freedom of speech, association, inquiry and academic freedom. The trial court in Conclusions of Law Number 8 found:

"To the extent that this action is based upon the Civil Rights Act of 1871 (42 U.S.C. Sec. 1983), the Ball State University Board of Trustees and Robert P. Bell, as President of Ball State University, are not proper defendants because, as instrumentalities of the State of Indiana, they are not considered 'persons' under 42 U.S.C. Sec. 1983. To the extent that this action is based directly upon the federal Constitution, only prospective equitable relief is generally permissible against an instrumentality of the state or its officers."

In his amended complaint Riggin named as defendants only the "Board of Trustees of Ball State University" and "Robert P. Bell as President of Ball State University."

IND.CODE 34–4–16.5–3 of the Indiana Tort Claims Act in part provides:

"A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from:

(5) the initiation of a judicial or administrative proceeding;

(6) the performance of a discretionary function;"

Clearly, immunity protects Ball State and its employees from liability for the initiation of a disciplinary proceeding, itself an administrative proceeding.

However, Riggin relies on *Seymour National Bank v. State* (1981), Ind., 422 N.E.2d 1223, *on rehearing*, 428 N.E.2d 203, *cert. dismissed* (1982), 457 U.S. 1127, 102 S.Ct. 2951, 73 L.Ed.2d 1344. That case granted immunity to the State and its police officers in a suit by third parties injured as a result of a high speed pursuit of a fleeing violator. The court on rehearing said:

"However, an employee's acts, although committed while engaging in the performance of his duty, might be so outrageous as to be incompatible with the performance of the duty undertaken. In such case, it cannot be said that the injury resulting therefrom resulted from the performance of duty."

*Seymour National Bank* at 204.

In *Jacobs v. City of Columbus, et al* (1983), Ind.App., 454 N.E.2d 1253, *trans. denied,* we noted that the above statement was dicta, being nothing more than an expression of a theoretical possibility, because that issue was not before the court. In *Jacobs,* also a defamation case, we applied IND.CODE 34–4–16.5–3 fully, and refused to rewrite it to include such words as wanton and willful, or outrageous and the like. We find no evidence in the record to support any theory that would limit the immunity provision and make it inapplicable to Ball State or its officers, trustees or employees.

Riggin claims the trial court erred in rendering summary judgment to the extent that it found that Ball State and its officials acted in bad faith. Testimony existed

that: (1) Mr. Parker, a trustee, was at odds, both politically and personally, with Riggin; and (2) one of the "ring leaders" in getting Riggin terminated, Dean Black, once assaulted him. Riggin contends that summary judgment was inappropriate since the above evidence established an issue of material fact as to the good faith, or lack thereof, of the officials involved. We disagree. The vote by the Board of Trustees was unanimous, and neither Trustee Parker nor Dean Black were members of the ad hoc committee. Such evidence establishes neither a genuine nor a material fact as to the issue of good faith.

■ Closely connected to the tort claims issue is the Section 1983 claim. Both parties argue numerous federal cases granting immunity in 1983 actions to states and their officers under the protection of the Eleventh Amendment to the United States Constitution. We first note that a 1983 action is an action in tort, and when it is filed in state court in Indiana, it becomes subject to the Indiana Tort Claims Act. *Indiana Department of Public Welfare v. Clark* (1985), Ind.App., 478 N.E.2d 699, *trans. denied.* Therefore, since the thrust of Riggin's claim is the initiation of the administrative proceedings, the immunities granted under IND.CODE 34–4–16.5–3(5) are applicable. The authorities cited and the conclusion reached in the discussion of Issue VII are applicable here. A conceivable argument may be available that the matter at issue grew out of contract, not tort, so that the Tort Claims Act was inapplicable. *See Crafton v. State* (1983), Ind. App., 450 N.E.2d 1042. Judicial review, as well as damages for breach of contract, were requested in Riggin's complaint. We presume, therefore, that the 1983 count envisioned something different. Contract and judicial review are dealt with on the merits elsewhere in this opinion. The conclusions there are applicable here.

■ Even if the matter was measured by federal standards, which the parties ar-

gue, the result would be the same. Ball State is an instrumentality of the State of Indiana for the purpose of the Eleventh Amendment, which prohibits federal suits by individuals against the states. Therefore, for federal court purposes, Ball State, the Board of Trustees, and the individual defendants in their official capacities are immune from suits for money damages under Section 1983.[1] *See Jackson v. Hayakawa* (9th Cir.1983), 682 F.2d 1344; *Quern v. Jordon* (1979), 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358; *Alabama v. Pugh* (1978), 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114. Suits against state boards and departments are suits against the state. *Peters v. Lieuallen* (9th Cir.1982), 693 F.2d 966. Only prospective injunctive relief is obtainable in federal court, *Peters, supra.* A board or state is not a person for purposes of a Section 1983 action. *Peters, supra; Quern, supra.* Moreover, none of the Ball State officials were named in their individual capacities. Absent explanation, a caption as used in the amended complaint is controlling. *Jackson, supra.*

We find no error.

Judgment affirmed.

ROBERTSON, P.J., and RATLIFF, J., concur.

---

1. The parties do not argue the question of whether the same immunity growing out of the Eleventh Amendment to the U.S. Constitution applies when Section 1983 actions are filed in state courts. Therefore, we need not decide that here.