**INDIANA DEPARTMENT OF ENVI-RONMENTAL MANAGEMENT, Appellant–Petitioner,**

v.

**Lynn C. WEST, Michael J. Dalton, and Phillip E. Wuensch, Appellees–Respondents.**

No. 49A02–0309–CV–752.

Court of Appeals of Indiana.

Aug. 9, 2004.

---

Steve Carter, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, for Appellant.

Melinda O'Dell, Mooresville, IN, for Appellees.

**OPINION**

SHARPNACK, Judge.

The Indiana Department of Environmental Management ("IDEM") appeals the trial court's denial of its petition for judicial review of the Indiana State Employees' Appeals Commission's ("SEAC") final order finding that IDEM had discriminated against Lynn West, Michael Dalton, and Phillip Wuensch (collectively, "Employees") on the basis of their age.

IDEM raises six issues, which we restate as:

I. Whether Employees' claims against IDEM are barred by the Eleventh Amendment and sovereign immunity;

II. Whether SEAC lacked jurisdiction to hear Employees' claims under Ind.Code § 4–15–2–35 because Employees were laterally transferred under Ind.Code § 4–15–2–24;

III. Whether SEAC violated the Open Door Law when it issued its final order;

IV. Whether the Chief Hearing Officer erred by admitting Employees' Exhibit M into evidence and whether SEAC erred by relying upon Employees' Exhibit M in issuing its final order;

V. Whether SEAC's factual findings are supported by the evidence; and

VI. Whether SEAC acted properly in fashioning an appropriate remedy.

We affirm.

The relevant facts follow. In 1998, IDEM announced that the Office of Solid and Hazardous Waste Management and the Office of Environmental Response would be merged together to create the Office of Land Quality. In the process of restructuring, IDEM reclassified many positions, including Employees' positions. Employees' new positions did not result in pay changes but did result in decreased managerial responsibility.

Before the restructuring, West's job was classified as Environmental Manager Supervisor 4, and the official job description defined the general purpose of the position as follows:

Incumbent is Chief of the Regulatory Development Section and is responsible for the direct supervision of five professional staff with overall responsibility for solid and hazardous waste rulemaking activities, coordination of rulemaking with policy development and Subtitle C & D authorization.

*Id.* at 105. Dalton was her direct supervisor. After the merger, she was offered only a position as a Senior Environmental Manager 1, which she accepted. This position was a "nonmanager position" that required her to do "staff work" instead of "management work." *Id.* at 315–316. She also moved from a larger section chief cubicle to a smaller staff cubicle. West had wanted a section chief position, but was never given the opportunity to compete for such a position. After West accepted the position of Senior Environmental Manager 1, "[i]t was very hard [for her] to come in to work the next day. It look[ed] like a demotion, it felt like a demotion," and "[she knew] that others viewed it as a demotion." *Id.* at 336.

Before the restructuring, Dalton's job was classified as Environmental Branch Chief E–7, and the official job description defined the general purpose of the position as follows:

The branch chief is the first-line manager and serves as a liaison between senior management and first-line supervisors (section chiefs) and staff, serving as an advocate of both senior management perspectives and staff concerns. The [Branch Chief] position is critical in maintaining institutional memory within the agency and in addressing technical and programatic [sic] issues to require a broader perspective than could be expected from first-line supervisors and staff. The [Branch Chief] focuses on leadership & management rather than supervision, the former emphasizing doing the right tasks and equipping the

program to execute those tasks, and the latter, focusing on "doing things right." Record at 62. After the merger, IDEM did not offer Dalton the opportunity to apply for the newly created Branch Chief E–6 position, which would have been equivalent to his Branch Chief E–7 position. Rather, IDEM offered Dalton a choice between two lower level positions, and eventually, Dalton accepted a position as Senior Environmental Manager Supervisor 3. As a Senior Environmental Manager Supervisor 3, Dalton's responsibilities decreased. He no longer supervised section chiefs and instead supervised staff members, and he moved from a private office to a section chief cubicle. Dalton referred to his new position as a demotion and said that based upon his skills and experience, he felt that he was qualified for the newly created Branch Chief E–6 position. As of the date of the hearing, the newly created Branch Chief E–6 position had not been filled.

Before the restructuring, Wuensch's job was classified as Environmental Manager Supervisor 4, which involved "supervising a group of people, including performance appraisals, signing attendance, [and] leave requests." *Id.* at 395. The official job description defined the general purpose of Wuensch's position as follows:

> Incumbent is Chief of the Administrative Support Section of the Operations Branch and is responsible for the direct supervision of eight professional staff with overall responsibility for managing the various budgetary and miscellaneous support function of the Office of Solid & Hazardous Waste Management. Report directly to Branch Chief.

*Id.* at 109. As a result of the merger, he was offered and accepted a position as Senior Environmental Manager 1, where his job description "changed drastically." *Id.* at 398. Wuensch was "no longer re-

sponsible for supervision, evaluating people, signing off any documents." *Id.* at 398. He was equal to people whom he had previously supervised, and he went from a large section chief cubicle to a smaller staff cubicle. Wuensch wanted the position of Section Chief of the Finance Section, which is the job with essentially the same duties and responsibilities that he had prior to the merger. Wuensch believed that his physical move affected his perceived status in his department.

Before the merger, Robert Moran, an IDEM employee over the age of forty, spoke with Assistant Commissioner, Mary Beth Tuohy, who had encouraged senior supervisors to take technical positions and to facilitate a reorganization. Privately, Tuohy told Moran that he should consider taking a "SEM 1" position, which would have been a demotion, because it would set a good example for all the other supervisors. *Id.* at 350. She hinted that if Moran did not voluntarily take the position she could use the "performance appraisal system" to accomplish the demotion. *Id.* at 351. She said she wanted "new blood with fresh ideas." *Id.* West had also heard that Tuohy had said that the "office could use some new blood and some—or some younger blood or some new blood and some new ideas." *Id.* at 325. Before the merger, IDEM promoted several employees, all of whom were under the age of forty. After the merger, they remained in their promoted positions.

Employees filed merit complaints with the State Personnel Department, alleging that IDEM had created unacceptable working conditions when it reclassified their jobs. Employees, who are all over forty years of age, also complained that as a result of the merger, staff members over forty had been demoted while staff members under forty had been promoted.

Rachel Scudder, IDEM's director of human resources, sent a memorandum to Wuensch, identifying the number and percentage of managers by age before and after the merger. The memorandum indicated that before the merger, there were thirty-nine managers of whom thirty-four were over the age of forty and five were under the age of forty. Thus, before the merger, 87% of the managers were over the age of forty and 13% were under the age of forty. After the merger, there were twenty-six managers of whom twenty-one were over the age of forty and five were under the age of forty. Thus, after the merger, 81% of the managers were over forty and 19% were under the age of forty.

Scudder denied Employees' complaints. All of the denials provided, in relevant part, that:

> The state classification system defines your move . . . as a lateral transfer, not a demotion. Your classification resulted in decreased management responsibility without a corresponding decrease in salary. Management has the authority to make such decisions based on agency need.

Appellees' Appendix at 7. The denials also indicated that Employees' allegations of age discrimination had been forwarded to IDEM's Affirmative Action Coordinator for investigation. Although Scudder denied Employees' complaints, she later testified that there was a "cause for concern" because all of the managerial demotions happened to employees over the age of forty. *Id.* at 517. She was not able to rule out the possibility that IDEM's facially neutral criterion had resulted in a disparate impact on employees over forty. *Id.* at 519–520. However, she determined that Employees' allegations had no merit because management of the Office of Land and Quality had assured her that they had used objective and reasonable criterion to place Employees. As of the date of the evidentiary hearing, there were no official job descriptions for Employees' current jobs.

Approximately three weeks after Scudder denied Employees' complaints, Employees received a letter from Bruce Baxter, the director of the Grievance Administration, indicating that he had investigated Employees' allegations of age discrimination and had found no substantiation for their claims. Baxter also indicated that Employees' reclassifications were considered lateral reclassifications, adding that Employees had lost no salary as a result of their job changes.

On January 4, 2000, Employees filed their notice of appeal to SEAC. SEAC conducted a fact finding hearing, and after the hearing, Chief Hearing Officer Jack Riggs ("Hearing Officer Riggs") issued the following findings of facts and conclusions thereon:

1. [Employees] were at all relevant times regular employees of [IDEM].

2. [Employees] complain that they were working out of class in their former positions and then were reclassified into less desirable positions on the basis of their age.

3. During the relevant time period, West was 47, Dalton was 46, and Wuensch was 60 years of age.

4. [IDEM] asserts that it has the statutory authority to reclassify positions and the decision to reclassify was not based upon [Employees'] ages. Further, [IDEM] asserts that [Employees] suffered no harm, since there was no loss of pay, and that in any event age discrimination is not prohibited for [IDEM's] employees.

5. Two offices within [IDEM], specifically the Offices of Solid and Hazardous Waste and the Office of Environmental Response, were consolidated to form the Office of Land Quality.

6. Prior to the merger there were 39 supervisory positions in the two offices. After the merger there were 26 supervisors in the Office of Land Quality.

7. The reclassification resulted in West and Wuensch being reclassified from Environmental Manager Supervisor (SAM PAT 4) to Senior Environmental Manager (PAT 1). Dalton was reclassified from Environmental Branch Chief (E–7) to Senior Environmental Supervisor (SAM PAT 3).

8. The reclassifications were lateral transfers defined by the State Personnel Department. The pay ranges for the old and new positions were the same.

9. [Employees] had all supervisory responsibilities removed and were moved from larger offices into smaller ones. Dalton was moved from a private office to a cubicle.

10. [Employees] were not given any opportunity to actively compete or interview for the positions.

11. No objective, definable standards were used at the time of the decision-making.

12. Mary Beth Touhy stated on more than one occasions during the reorganization that [IDEM] needed "new blood" and needed people who could offer "new and fresh ideas."

13. All six effected [sic] employees over the age of 50 years were moved in the hierarchy.

14. All seven effected [sic] employees under the age of 40 were either retained as supervisors or promoted.

15. Of the twenty-three effected [sic] employees between the age of 40 and 49, sixteen were retained or promoted and seven were moved down.

16. By a preponderance of the evidence, [Employees] have proven that age bias was a significant factor in reorganization.

17. Pursuant to *Grenard v. State Employees' Appeals Commission,* 494 N.E.2d 341, 344, this Commission has jurisdiction over complaints relating to terms and conditions of employment as:

Any state, circumstance, situation, etc. the employee encounters in his employment that reasonably relates to the employment relationship or environment. Among other things, the term includes hours of employment, administration of employee benefits, rules which regulate the manner in which employees perform their work and the amount of work expected, holiday and vacation time and sick leave.

18. The changes imposed on [Employees] effected [sic] a term and condition of employment within the meaning of Grenard.

19. The Indiana Code at 4–15–2–35 provides a remedy for merit employees subjected to age discrimination.

20. [IDEM] failed to provide any credible evidence of legitimate job-related factors in the selection process.

21. Less desirable assignments and working conditions imposed upon employees, based upon age discrimination are unlawful, whether the

employee suffers a loss in pay or not.

22. [Employees] were not able to prove whether they were, in particular, the victims of discrimination and that they were deserving of retention and/or promotion.

23. [Employees] bear the ultimate burden of proving that they are entitled to the remedy sought.

24. Inappropriate factors were used in the selection process; however, it is not sufficient to justify displacing a current employee.

25. [IDEM] should be required to give good faith consideration and interviews to [Employees] for any of the 26 positions currently vacant or as they become vacant.

26. [West and Wuensch] were not proven to have been working significantly above their classification prior to the reorganization.

27. [Dalton] was shown to have worked out of class until January 1999. Since Dalton's complaint was not filed until October, 1999 and the Commission's jurisdiction extends back only 30 days, this portion of the complaint is untimely.

ORDER

[Employees'] relief is GRANTED in part and DENIED in part. [Employees'] working out of class complaint is DENIED. [Employees] shall be granted good faith and consideration and interviews for any vacant effected [sic] positions and for any future vacancies in effected [sic] positions.

Appellant's Appendix at 22–25. Employees and IDEM submitted objections to Hearing Officer Riggs's findings of fact and conclusions thereon. After reviewing Employees' and IDEM's objections, and after an open meeting, SEAC issued an Order for Submission of Briefs, which provided, in relevant part, that:

1. On February 22, 2001 the [SEAC] at Open Meeting reviewed the Proposed Order of the Administrative Law Judge, the Parties' Objections and the record of the proceeding.

2. Upon Motion duly made and seconded the Commission upheld the Report of Hearing Officer related to findings of illegal and intentional age discrimination committed by [IDEM] and against [Employees] in contravention of IC 4–15–2–35. The vote was 3–0. . . . .

3. Parties are directed to file briefs to recommend an appropriate remedy.

Record at 165–166. On April, 18, 2001, SEAC held a regular meeting, wherein it ordered Hearing Officer Riggs to make changes to the draft document and then issue SEAC's order. On May 9, 2001, SEAC issued its final order, which provided in relevant part:

\*　　\*　　\*　　\*　　\*　　\*

5. I.C. 4–15–2–35 states in pertinent part:

"If the Commission finds that the action taken against the employee was taken on the basis of politics, religion, sex, *age,* race, or because of membership in an employee organization, the employee *shall* be reinstated to his position without loss of pay." [emphasis added]

6. Given the statutory language cited above as well as the numerous proclamations made by the State Personnel Department and other state officials, [IDEM's] repeated assertions that state merit employees do not have the right to be free of age discrimination is entirely unfounded.

7. Some of the points made in [IDEM's] Objections and briefs will be examined individually before the Commission turns to more specific findings.

\* \* \* \* \* \*

D. ... [IDEM] states that Dalton was not demoted. Yet, his current position is equivalent to Ms. West's previous position. Since Dalton was Ms. West's supervisor prior and now his position is the same as West's was, it is clear that despite [IDEM's] semantics, in clear common sense, these [Employees] were demoted.....

E. ... Robert Moran testified that if he didn't voluntarily move to a non supervisory position that Tuohy said she would get him through the performance appraisal system. As well as telling him that she wanted "new blood and new ideas," Tuohy told him she "had somebody in mind" for the position. (Tr.p.140) Bill Hays stated that Tuohy told him that he would never be a supervisor again and that she wanted new blood and fresh ideas (Tr.p.171) and that new people were needed to "revitalize the office." (Tr.p. 178) The Commission is entitled to draw reasonable inferences from the evidence. Under these circumstances and coupled with the threats of disciplinary action, the Commission finds an age bias in the statements.....

F. ... Moran testified that several people all less then 40 years of age were promoted just prior to the merger (Tr.p.144) and that the only common element of the people promoted was their ages. (Tr.p.159) ... The Commission finds that the promotion of these younger employees was part of [IDEM's] strategy to displace the older supervisors.

\* \* \* \* \* \*

8. The Hearing Officer's Report and Order is adopted, except as otherwise noted in this Final Order, and is hereby incorporated by reference.

9. Finding No. 22 is modified as follows, "[Employees] provided that they were part of a group of employees that was discriminated against on the basis of age."

10. Finding No. 23 is modified as follows, "[Employees] bear the ultimate burden of proof that they are entitled to the remedy sought. [Employees] proved that the adverse action taken against them was a result of unlawful age discrimination under I.C. 4–15–2–35."

11. Finding No. 24 is modified as follows, "The Commission finds that when a violation of the non discrimination portion of I.C. 4–15–2–35 is found, the statute requires the Commission to fashion a remedy for that discrimination."

12. Finding No. 25 is modified as follows, "[IDEM] did not provide good faith consideration to [Employees] prior to choosing the employees to remain as supervisors."

13. Finding No. 26 is modified as follows, "[West and Wuensch] were proven to have been work[ing] out of class in a higher classification. The complaint however was untimely and the Commission has no jurisdiction to order back pay for the period more than 30 days prior to the filing of the complaint."

14. Finding No. 28 is added as follows, "The jobs in which [Employ-

ees] were placed after the merger were of lower status, responsibility and importance than their previous positions."

15. **Finding No. 29 is added as follows, "[IDEM] promoted several younger supervisors immediately prior to the merger in order to facilitate their retaining supervisory positions. All of these persons were less than 40 years of age."**

16. Finding No. 30 is added as follows, "[Employees] have proven that they were discriminated against on the basis of their ages, that it has adversely affected the terms and conditions of their employment, and that Indiana law requires the Commission to construct a remedy."

17. Finding No. 31 is added as follows, "[Employees] West and Dalton filed their complaints on October 19, 1999, and [Wuensch] filed his complaint on October 18, 1999. [Employees] shall receive back pay for these ordered promotions beginning 30 days prior to the filing of the complaints."

18. Finding No. 32 is added as follows, "Therefore the Commission finds that [Employees] should be placed in the supervisory positions from which [Employees] were unlawfully excluded with full back pay, supervisory responsibilities and offices restored."

19. Finding No. 33 is added as follows, "This Order is adopted by Motion duly made and seconded on Open Meeting on April 18, 2001. The vote was 5–0."

*Id.* at 30–31. SEAC ordered that:

[Dalton] shall be placed in an E–6 position ... West and Wuensch shall be placed in EMS 3 positions. Each shall be placed into a position that is generally within the area of [Employees'] expertise. Offices and duties commensurate with these jobs titles shall be established and all back pay provided to [Employees] as soon as possible. The lack of vacant positions shall not be deemed any sort of excuse for failure to immediately implement this Order. The Commission finds that since this matter arises solely due to the unlawful discrimination by [IDEM], that [IDEM] must deal with any double-slotting, layoffs or budgetary impacts from its own resources. Due to Findings of bad faith and considering that [Employees] would have already held these positions for almost two years in the absence of discrimination, the Commission further orders that the probationary period be waived and that [Employees] be immediately granted permanent status in their newly ordered positions.

*Id.* at 31.

IDEM filed a petition for judicial review. The trial court issued an order denying IDEM's petition, and later issued an amended order, which provided as follows:

\*　\*　\*　\*　\*　\*

4. The Findings made and Final Order issued by the [SEAC] is supported by substantial, reliable, and probative evidence, and therefore shall not be disturbed.

5. This Court adopts the Findings and May 9, 2001 Order of the [SEAC] in their totality, and incorporates said Findings and Decision in this Order as if they were fully set forth herein.

*Id.* at 6–7.

## I.

 The first issue is whether Employees' claims against IDEM are barred by

the Eleventh Amendment and sovereign immunity. IDEM places significant reliance on *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). There, the United States Supreme Court held that the Age Discrimination in Employment Act ("ADEA") was not appropriate legislation under § 5 of the Fourteenth Amendment, and therefore the ADEA's purported abrogation of the States' sovereign immunity was invalid. 528 U.S. at 91, 120 S.Ct. at 650. We disagree that *Kimel* is instructive in this matter because, here, unlike the employees in *Kimel*, Employees did not bring a federal ADEA claim against IDEM. Rather Employees filed a merit complaint with the State Personnel Department. Employees had authority to file such a merit complaint pursuant to Ind.Code § 4-15-2-35 (1998), which provides, in relevant part, that:

Any regular employee may file a complaint if his status of employment is involuntarily changed or if he deems conditions of employment to be unsatisfactory.

\* \* \* \* \* \*

If the commission finds that the action against the employee was taken on the basis of politics, religion, sex, *age*, race or because of membership in an employee organization, the employee shall be reinstated to his position without loss of pay. In all other cases the appointing authority shall follow the recommendation of the commission which may include reinstatement and payment of salary or wages lost by the employee which may be mitigated by any wages the employee earned from other employment during a dismissed or suspended period.

(emphasis added). Because Employees' claims are based upon an Indiana Statute and not the ADEA, IDEM's argument fails.

II.

The next issue is whether SEAC lacked jurisdiction to hear Employees' claims under Ind.Code § 4-15-2-35 because Employees were laterally transferred under Ind.Code § 4-15-2-24 (1998). I.C. § 4-15-2-35 provides that an employee may file a complaint "if his status of employment is involuntarily changed. . . ." IDEM argues that Employees' status of employment was not involuntarily changed because they had been appropriately transferred under Ind.Code § 4-15-2-24, which provides that "[a]n appointing authority may at any time assign an employee from one position to another position in the same class or rank in his division of the service."

IDEM likens this matter to *Goffredo v. Ind. State Dep't of Public Welfare*, 419 N.E.2d 1337 (Ind.Ct.App.1981).[1] There,

---

1. IDEM also argues that SEAC's finding number eight that Employees were "laterally transferred" is inconsistent with the trial court's finding number twenty-eight that "[t]he jobs in which [Employees] were placed after the merger were of lower status, responsibility and importance than their previous positions." Appellant's Appendix at 23, 30. IDEM suggests that SEAC properly found that IDEM laterally transferred Employees and that such transfers were appropriate under I.C. § 4-15-2-24 (1998). We disagree with IDEM's argument that the two findings are inconsistent. Finding number eight provides as follows: "The reclassifications were lateral transfers defined by the State Personnel Department. The pay ranges for the old and new positions were the same." *Id.* at 23. This finding referenced the State Personnel Department's written denials of Employees' merit complaints that provided in relevant part, that: "The State classification system defines your move . . . as a lateral transfer." *Id.* at 32, 36, and 40. Finding number eight is not inconsistent with finding number twenty-eight, and IDEM's argument is without merit.

Goffredo was transferred from her position as a hearing officer to in-house counsel. *Id.* at 1337. Her position as in-house counsel required "different work requirements and responsibilities, but was of the same status, classification, and salary as [Goffredo's] original position." *Id.* Goffredo filed a merit complaint, and SEAC found that she had been transferred for punitive reasons and directed that she be returned to her original position. *Id.* The trial court, relying upon I.C. § 4–15–2–24, reversed, and we affirmed the trial court's decision. *Id.* at 1338. We noted that Goffredo was "laterally transferred and not demoted," and we held that SEAC's "finding was incorrect as a matter of law because the record clearly demonstrate[d] that Goffredo's second position was of the same status, classification, and salary." *Id.* at 1338–1339. We added that "although the job had different responsibilities, it was not a demotion." *Id.* at 1339.

IDEM argues that like Goffredo, Employees were laterally transferred in accordance with I.C. § 4–15–2–24 and, therefore, lacked the jurisdiction to complain about their transfer under I.C. § 4–15–2–35. We find *Goffredo* distinguishable from this matter. Although Goffredo's new position required different work requirements and responsibilities, it was the same status as her original position. Here, however, Employees argued and SEAC found that "[t]he jobs in which [Employees] were placed after the merger were of lower status, responsibility and importance than their previous positions." Appellant's Appendix at 30.

Before the merger, Dalton was Branch Chief E–7 and was responsible for, among other things, supervising section chiefs. After the merger, Dalton moved to Environmental Manager Supervision 3. His responsibilities decreased, he was no longer supervising section chiefs and instead su-pervised staff members, and he moved from a private office to a cubicle. Before the merger, West had managerial responsibilities as the Environmental Manager Supervisor 4 to Senior Environmental Manager 1, but after the merger, as the Senior Environmental Manager 1, she did staff work instead of management work. She also moved from a larger section chief cubicle to a smaller staff cubicle, and said that "[i]t look[ed] like a demotion, it felt like a demotion," and "I know that others viewed it as a demotion." Record at 336. Likewise, after Wuensch's move from Section Chief to Senior Manager, he was "no longer responsible for supervision, evaluating people, signing off any documents," he was equal to people whom he had previously supervised, and he went from a large section chief cubicle to a smaller staff cubicle. *Id.* at 398–401. He also believed that his physical move affected his perceived status in the department.

■ I.C. § 4–15–2–35 provides that "[a]ny regular employee may file a complaint if his *status* of employment is involuntarily changed," (emphasis added) and, here, unlike *Goffredo,* Employees' positions after the merger amounted to a change in status, and were not lateral transfers under I.C. § 4–15–2–24. Employees, therefore, did not lack the ability, as IDEM suggests, to complain about their alleged change in status under I.C. § 4–15–2–35. *See, e.g., Grenard v. State Employees' Appeals Comm'n,* 494 N.E.2d 341, 344–345 (Ind.Ct.App.1986) (holding that the trial court erred by finding that SEAC did not have jurisdiction under I.C. § 4–15–2–35 to hear the employee's complaint).

## III.

■ The next issue is whether SEAC violated the Open Door Law when it issued its final order because it failed to deliberate and vote on the final order at an open

meeting. *See* Ind.Code § 5–14–1.5–1 to –8 (Supp.2003). The purpose of the Open Door Law is to assure that the business of the State of Indiana and its political subdivisions be conducted openly so that the general public may be fully informed. *Frye v. Vigo County,* 769 N.E.2d 188, 192 (Ind.Ct.App.2002); Ind.Code § 5–14–1.5–1 (1998). We are required to liberally construe the statute in order to give effect to the legislature's intention. I.C. § 5–14–1.5–1. The Open Door Law requires that "all meetings of the governing bodies of public agencies must be open at all times for the purpose of permitting members of the public to observe and record them." Ind.Code § 5–14–1.5–3(a) (1998). Further, "[a] final action must be taken at a meeting open to the public." Ind.Code § 5–14–1.5–6.1(c). The term "final action" is defined as "a vote by the governing body on any motion, proposal, resolution, rule, regulation, ordinance, or order." Ind.Code § 5–14–1.5–2(g). Moreover, the Open Door Law provides that "an action may be filed by any person in any court of competent jurisdiction to ... declare void any policy, decision, or final action." Ind.Code § 5–14–1.5–7(a)(3) (Supp.2003).

Here, SEAC held a regular open meeting on April 18, 2001. The minutes to the meeting indicate that SEAC "reviewed a draft order and directed Chief Hearing Officer Jack Riggs to make specific changes in the Draft and issue the Commission's Order. The vote was 3 to 0 with Commissioner Mernitz recusing herself." Appellant's Appendix at 58. On May 9, 2001, SEAC issued its final order, which provided that "This Order is adopted by Motion duly made and seconded on Open Meeting on April 18, 2001. The vote was 5–0." *Id.* at 31.

IDEM argues that we should void SEAC's final order because SEAC failed to have an open meeting on May 9, 2001, the day it took final action and issued the final order granting Employees' claims. IDEM also argues that although the final order indicates that SEAC voted on the final order at the April 18, 2001, regular meeting, the meeting minutes indicate that SEAC did not vote on the final order but, rather, voted three to zero to order Hearing Officer Riggs to make specific changes to the draft. IDEM argues that because SEAC failed to comply with the requirements of the Open Door Law, we should declare SEAC's final order void in accordance with Ind.Code § 5–14–1.5–7 (Supp. 2003).

■ We agree with IDEM that SEAC failed to fully comply with the Open Door Law. Although the final order indicates that SEAC voted five to zero to adopt the final order at the April 18, 2001, regular meeting, the meeting minutes from April 18, 2001, indicate that SEAC did not vote on the final order but, rather, voted three to zero to order Hearing Officer Riggs to make specific changes to the draft and to issue SEAC's order. Moreover, the minutes also indicate that only four commissioners were present at the April 18, 2001, meeting, making it impossible for SEAC to adopt the final order by a vote of five to zero on April 18, 2001. Therefore, sometime between April 18, 2001, and May 9, 2001, SEAC voted five to zero to adopt the final order. This vote was not conducted at an open meeting as required by the Open Door Law. Because the Open Door Law requires that all final actions be taken at meetings open to the public, we conclude that SEAC failed to fully comply with the Open Door Law.

However, although we conclude that SEAC failed to fully comply with the statutory provision of the Open Door Law, our

analysis does not end here.[2] We have previously held that substantial compliance with the Open Door Law may in some circumstances be sufficient. For example, in *Riggin v. Bd. of Tr. of Ball State Univ.*, Ball State University sought to discharge a tenured business professor, and the departmental dean brought formal charges against the professor. 489 N.E.2d 616, 619–620 (Ind.Ct.App.1986), *trans. denied.* An ad hoc hearing committee of the University Senate Judicial Committee conducted hearings, the Board of Trustees reviewed the hearings, and the professor's employment was terminated. *Id.* at 619–620. The professor filed an action alleging that the ad hoc hearing committee violated the Open Door Law because it failed to conduct open hearings. *Id.* at 621. The trial court granted the Board of Trustees' motion for summary judgment, and we affirmed. *Id.* at 623. In affirming, we held that the "Open Door Law applie[d] to the ad hoc committee. However, since ... Ball State substantially complied with the [Open Door Law], such a holding does not demand a reversal on the facts of this case." We added that:

> The proceedings at issue involve a private contractual matter between [the professor] and Ball State which had only a secondary interest to the general pub-lic.... There is likewise no suggestion that [the professor] was prejudiced by the manner in which the hearing was conducted.
>
> Though not provided as a matter of right, [the professor], following the decision and report made by the ad hoc committee, was in fact afforded a full review of his case by the Board of Trustees. The individual trustees stated that they had read the transcript. That review hearing complied with the Open Door Law. [The professor], appearing in person and by counsel and, without restriction, presented what he wished to present. Clearly there has been no prejudice to [the professor] in the presentation of the merits of his case, and in fact, he claims none. His argument is merely technical in that his complaint regards the lack of public notice and the failure to post an agenda prior to the ad hoc committee hearing.

*Id.* at 623–624. We also recognized that "[t]his result has support from other jurisdictions." *Id.* at 624.

Further, in a 1987 amendment to Ind. Code § 5–14–1.5–7 our legislature confirmed the use of substantial compliance as the proper standard to review violations under the Open Door Law.[3] Ind.Code § 5–14–1.5–7(d) currently provides that:

---

**2.** Employees argue that we should also consider the practical constraints placed upon SEAC by the State Personnel Act, which provides that "[w]ith respect to all appeals, the commission shall render its decision within thirty (30) days after the date of the hearing on the appeal." I.C. § 4–15–2–35. Employees emphasize the fact that SEAC is a "part time" commission, and "its members have only a portion of their time allotted to this function." Appellee's Brief at 20. Employees suggest that:

> If [IDEM's] argument is followed to its logical conclusion, it would be physically impossible for the [SEAC] to render any decision within thirty days of a hearing on an appeal. If the [SEAC] was not allowed to direct the administrative hearing officer to complete the ministerial duties associated with its decisions, the [SEAC] would be regularly in violation of the thirty-day requirement.

We recognize the difficulty SEAC might have in complying with both the State Personnel Act and the Open Door Law. However, as we noted in *Riggin v. Bd. of Tr. of Ball State Univ.*, 489 N.E.2d 616, 623 (Ind.Ct.App.1986), *trans. denied:*

> [al]though we may ... agree that the [Open Door Law] is too broad, cumbersome and unwieldy, ... our function is not to judge the wisdom of the Act, but only its meaning.

**3.** *See* Pub.L. No. 67–1987, § 6 (approved April 16, 1987) (adding subsection (d) to Ind. Code § 5–14–1.5–7).

In determining whether to declare any policy, decision, or final action void, a court shall consider the following factors among other relevant factors:

(1) The extent to which the violation:

(A) affected the substance of the policy, decision, or final action;

(B) denied or impaired access to any meetings that the public had a right to observe and record; and

(C) prevented or impaired public knowledge or understanding of the public's business.

(2) Whether voiding of the policy, decision, or final action is a necessary prerequisite to a substantial reconsideration of the subject matter.

(3) Whether the public interest will be served by voiding the policy, decision, or final action by determining which of the following factors outweighs the other:

(A) The remedial benefits gained by effectuating the public policy of the state declared in section 1 of this chapter.

(B) The prejudice likely to accrue to the public if the policy, decision, or final action is voided, including the extent to which persons have relied upon the validity of the challenged action and the effect declaring the challenged action void would have on them.

(4) Whether the defendant acted in compliance with an informal inquiry response or advisory opinion issued by the public access counselor concerning the violation.

See also *Town of Merrillville v. Blanco*, 687 N.E.2d 191, 197 (Ind.Ct.App.1997)

(noting that when making a determination on substantial compliance of the Open Door Law, "[s]everal factors are considered, including the extent to which the violation denied or impaired access to a meeting, and prevented or impaired public knowledge or understanding of the business conducted in the meeting"), *reh'g denied, trans. denied.*

Based upon our review of the record, we conclude that SEAC substantially complied with the Open Door Law. SEAC's violation did not substantially "[affect] the substance of the policy, decision, or final action." I.C. § 5–14–1.5–7(d)(a)(A). IDEM had an opportunity to be heard and voice its objections to the hearing officer's order. Moreover, IDEM does not suggest that SEAC failed to provide adequate notice of its April 18, 2001, SEAC regular meeting wherein SEAC reviewed a draft order dated April 12, 2001, and directed the hearing officer to make the specific changes recommended in the draft order and to issue SEAC's final order. We also note that the April 12, 2001, draft order is nearly identical to the May 9, 2001, final order. There has been no prejudice to IDEM in the presentation of the merits of this case, and its argument is merely technical. Thus, SEAC substantially complied with the Open Door Law when it issued its final order. *See, e.g., Riggin*, 489 N.E.2d at 624.

## IV.

■ The next issue is whether Hearing Officer Riggs erred by admitting Employees' Exhibit M into evidence and whether SEAC erred by relying upon Employees' Exhibit M when issuing its final order.[4]

---

4. IDEM also argues that SEAC erred by admitting Employees' Exhibit N into evidence. However, IDEM did not object to the admission of this exhibit at the evidentiary hearing,

and the failure to object to a procedure at trial or at a hearing operates as a waiver of the issue on appeal. *Swingle v. State Employ-*

Employees' Exhibit M was admitted during Wuensch's testimony. Wuensch referenced a memorandum sent to him by Scudder, and in the memorandum, Scudder included a table, indicating the number and percentage of managers by age before and after the merger. Wuensch, relying upon this memorandum, created a graph explaining the ages of managers "removed or moved down" as a result of the merger process. Record at 409. Wuensch said that, based upon Scudder's memorandum, he concluded that all of the managers who were either removed or moved down were over the age of forty. Employees then offered Wuensch's graph as Employees' Exhibit M, a summary exhibit of Wuensch's testimony, and IDEM objected, arguing that:

> [Employees' Exhibit M] says, "managers removed or moved down." That's an inaccurate description of what happened during the merger when the merger occurred and these people were reclassified and given lateral transfers. So, it's totally inaccurate to state that, and if he's testified already about the numbers, I think that would suffice.

*Id.* at 410–411. Hearing Officer Riggs admitted Employee's Exhibit M over IDEM's objection, noting that the point of the evidentiary hearing was, in part, to determine whether Employees had in fact been removed or moved down. He also said that he "would not be fooled by the title at the top" of the exhibit. *Id.* at 411. On appeal, IDEM argues that Hearing Officer Riggs erred by admitting Employees's Exhibit M into evidence.[5]

Ind.Code § 4–21.5–3–26 (1998) governs the admission of evidence at an administrative hearing and provides, in relevant part, that:

> This section and section 25 of this chapter govern the conduct of any hearing conducted by an administrative law judge. Upon proper objection, the administrative law judge shall exclude evidence that is irrelevant, immaterial, unduly repetitious, or excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts. In the absence of proper objection, the administrative law judge may exclude objectionable evidence. The administrative law judge may admit hearsay evidence. If not objected to, the hearsay evidence may form the basis for an order. However, if the evidence is properly objected to and does not fall within a recognized exception to the hearsay rule, the resulting order may not be based solely upon the hearsay evidence.

Moreover, an administrative proceeding is not rendered invalid by the admission of evidence which would have been inadmissible in a trial court if there is substantial evidence supporting the administrative law judge's determination. *City of Evansville v. Southern Ind. Gas & Elec. Co.,* 167 Ind.App. 472, 485, 339 N.E.2d 562, 572–573 (1975).

IDEM did not object to the admission of the memorandum from Scudder to Wuensch, and Wuensch relied upon this memorandum when creating the graph admitted in Employees' Exhibit M. The in-

---

*ees Appeal Comm'n,* 452 N.E.2d 178, 180–181 (Ind.Ct.App.1983).

5. IDEM also argues that Hearing Officer Riggs erred by admitting Employees' Exhibit M into evidence because the statistical sample was too small to be predictive of disparate treatment, it contained unreliable statistical

information, and it was unreliable because it was not validated by an expert or authenticated. IDEM did make this objection at the evidentiary hearing, and has therefore waived review of this issue on appeal. *Swingle,* 452 N.E.2d at 180–181.

formation contained in this graph was merely cumulative but not unduly repetitive of the statistical information contained in the Scudder memorandum. Based upon our review of the record, we cannot say that Employees' Exhibit M was "irrelevant, immaterial, unduly repetitious, or excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts." I.C. § 4–21.5–3–26. Thus, there is substantial evidence supporting Hearing Officer Riggs' admission of Employees' Exhibit M into evidence, and SEAC did not err by relying upon Employees' Exhibit M in issuing its final order.

### V.

■ Next, we consider whether SEAC's factual findings are supported by the evidence. Judicial review of an administrative decision is limited to a determination of whether the agency lacked subject matter jurisdiction or employed improper procedures, or whether the decision was unsupported by substantial evidence or was arbitrary, capricious, or in violation of constitutional, statutory or legal principles. *Ad Craft, Inc. v. Bd. of Zoning Appeals of Evansville*, 693 N.E.2d 110, 113 (Ind.Ct. App.1998), *reh'g denied, trans. denied; see* Ind.Code § 4–21.5–5–14(d) (1998). We must review the record of the proceedings in the light most favorable to the administrative proceeding and we cannot reweigh the evidence. *Ad Craft, Inc.*, 693 N.E.2d at 113. We are free to resolve any legal questions that arise from the agency's decision, and we are not bound by its interpretation of the law because the law is the province of the judiciary. *Andrianova v. Ind. Family and Soc. Services Admin.*, 799 N.E.2d 5, 7 (Ind.Ct.App.2003). When reviewing an administrative agency's decision, the trial court may not try the facts de novo or supplant the agency's judgment with its own. *Id.* When reviewing a decision of an administrative agency, appellate courts stand in the same position as the trial court. *Ind. Alcoholic Beverage Comm'n. v. Edwards*, 659 N.E.2d 631, 632 (Ind.Ct.App.1995). The party asserting the invalidity of the agency action bears the burden of establishing its invalidity. *Ad Craft, Inc.*, 693 N.E.2d at 113; *see* Ind.Code § 4–21.5–5–14(a).

■ Employees presented evidence that West, Dalton, and Wuensch, who were over the age of forty, were demoted as a result of the merger. Scudder, IDEM's director of human resources, testified that there was a cause for concern because all of the managerial demotions happened to employees over the age of forty and that she was unable to rule out the possibility that IDEM's facially neutral criterion had had a disparate impact on employees over forty. She also said that her department had taken Employees' allegations seriously but had ultimately determined that the allegations had no merit because management of the Office of Land and Quality had assured her that they had used objective and reasonable criterion to place Employees. However, Employees also presented evidence, that on the date of the evidentiary hearing, there were still no job descriptions for their current jobs.

Employees also presented evidence of a memorandum from Scudder to Wuensch identifying the number and percentage of managers by age before and after the merger. The memorandum indicated that before the merger, there were thirty-nine managers and thirty-four were over the age of forty and five were under the age of forty. Thus, before the merger, 87% of the managers were over forty and 13% were under the age of forty. After the merger, there were twenty-six managers and twenty-one were over the age of forty and five were under the age of forty.

Thus, after the merger, 81% of the managers were over forty and 19% were under the age of forty.

Further, Moran, an IDEM employee, testified that before the merger, IDEM's Assistant Commissioner, Tuohy, had encouraged senior supervisors to take technical positions in order to facilitate a reorganization. Privately, Tuohy told Moran that he should consider taking a demotion because it would set a good example for all the other supervisors. She hinted that if Moran did not voluntarily take the technical position she could use the "performance appraisal system" to accomplish the demotion. *Id.* at 351. She said she wanted "new blood with fresh ideas." *Id.* West said that Tuohy had said that the "office could use some new blood and some—or some younger blood or some new blood and some new ideas." *Id.* at 325. Employees also presented evidence that before the merger, IDEM promoted several employees, who were all under the age of forty, and that after the merger, they remained in their promoted positions.

In SEAC's final order, it found that Employees had all been demoted. It also found that although Scudder testified that the Office of Land and Quality had told her that it had used objective and reasonable criterion to place Employees, Employees did not have job descriptions on the date of the evidentiary hearing, and SEAC found it "difficult to imagine much in a way of formal criterion when the job itself has not yet been defined with a job description." Appellant's Appendix at 30. SEAC also concluded that there was an "age bias" in Tuohy's statements, and concluded that the promotion of the younger employees was IDEM's "strategy to displace the older supervisors." *Id.* at 28. SEAC ultimately concluded that IDEM had discriminated against Employees on the basis of their age. Based upon our review of the record, we cannot say that SEAC's conclusion that Employees were discriminated on the basis of the age is unsupported by substantial evidence or is arbitrary, capricious, or in violation of constitutional, statutory or legal principles.

## VI.

The final issue is whether SEAC acted properly in fashioning an appropriate remedy. In Chief Hearing Officer Riggs's report and order, he ordered that "[Employees shall be granted good faith consideration and interviews for any vacant effect position and for any future vacancies in effected [sic] positions.]" Appellant's Appendix at 25. SEAC concluded that IDEM had not acted in good faith, noting that the "lack of good faith consideration is at the heart of this complaint." *Id.* at 27. SEAC amended Hearing Officer Riggs' order, and ordered that:

> [Dalton] shall be placed in an E–6 position ... West and Wuensch shall be placed in EMS 3 positions. Each shall be placed into a position that is generally within the area of [Employees'] expertise. Offices and duties commensurate with these jobs [sic] titles shall be established and all back pay provided to [Employees] as soon as possible. The lack of vacant positions shall not be deemed any sort of excuse for failure to immediately implement this Order. The Commission finds that since this matter arises solely due to the unlawful discrimination by [IDEM], that [IDEM] must deal with any double-slotting, layoffs or budgetary impacts from its own resources. Due to Findings of bad faith and considering that [Employees] would have already held these positions for almost two years in the absence of discrimination, the Commission further orders that the probationary period be waived and that [Employees] be immedi-

ately granted permanent status in their newly ordered positions. *Id.* at 31. IDEM argues that this relief is too broad and violates the separation of powers because it orders IDEM to promote Employees to positions that do not exist. IDEM argues that SEAC does not have the authority to order IDEM to create additional jobs and that that authority rests solely with the State Personnel Department. IDEM directs our attention to I.C. § 4–15–2–35, which provides that:

> If the commission finds that the action against the employee was taken on the basis of politics, religion, sex, age, race or because of membership in an employee organization, the employee shall be reinstated to his position without loss of pay. In all other cases the appointing authority shall follow the recommendation of the commission which may include reinstatement and payment of salary or wages lost by the employee which may be mitigated by any wages the employee earned from other employment during a dismissed or suspended period.

IDEM argues that the remedy ordered by SEAC falls outside the scope of this section.

■■■ IDEM likens this matter to *Logansport State Hosp. v. W.S.,* 655 N.E.2d 588 (Ind.Ct.App.1995). There, W.S. was a patient at a mental health facility and the facility's commissioner filed a petition seeking the involuntary commitment of W.S. *Id.* at 589. The trial court ordered that W.S. be committed to a mental health facility, noting that the Fort Wayne Developmental Center ("FWDC") would be the best equipped facility to care for W.S. *Id.* However, FWDC was understaffed, so the trial court ordered that W.S. be committed to FWDC but also ordered the FWDC to hire sixty additional direct care providers. *Id.*

FWDC filed an interlocutory appeal, arguing that the trial court's order violated the separation of powers. *Id.* FWDC argued that the Indiana Constitution imposed the duty on the legislature to provide for individuals who have a mental illness, and therefore, the "responsibility for establishing and supporting institutions such as FWDC lies with the General Assembly." *Id.* FWDC argued that this duty is nondelegable. *Id.* We held that "[b]ecause it [was] the express duty of the Indiana General Assembly and not of the courts to provide for the staffing and maintenance of facilities such as FWDC, ... the trial court overstepped its authority by ordering FWDC to hire more medical staff." *Id.* at 590.

*Logansport* is distinguishable from this matter. Here, the legislature expressly delegated certain powers and responsibilities to SEAC, and in fashioning the remedy in this matter, SEAC was simply carrying out its duties and responsibilities as envisioned by the legislature. The legislature expressly created SEAC, indicating that the "appeals commission shall be totally separate and independent of the personnel board." *See* Ind.Code §§ 4–15–1.5–1, 8 (1998). Specifically, the legislature authorized SEAC to do the following:

> (1) To hear or investigate those appeals from state employees as is set forth in IC 4–15–2, and fairly and impartially render decisions as to the validity of the appeals or lack thereof. Hearings shall be conducted in accordance with IC 4–21.5.
>
> (2) To make, alter, or repeal rules by a majority vote of its members for the purpose of conducting the business of the commission, in accordance with the provisions of IC 4–22–2.
>
> (3) *To recommend to the personnel director such changes, additions, or deletions to personnel policy which the appeals commission feels would be beneficial and desirable.*

Ind.Code § 4–15–1.5–6 (1998) (emphasis added). Further SEAC's recommendations are mandatory, not advisory. I.C. § 4–15–2–35 provides that:

> If the commission finds that the action against the employee was taken on the basis of politics, religion, sex, age, race or because of membership in an employee organization, the *employee shall be reinstated to his position without loss of pay.*

(emphasis added).

The legislature expressly delegated specific responsibilities to SEAC, and, here, the relief ordered by SEAC is the type of relief envisioned by both I.C. § 4–15–1.5–6 and I.C. § 4–15–2–35. Thus, we hold that SEAC acted properly in fashioning an appropriate remedy.

Conclusion

In summary, we hold that: (1) Employees' claims against IDEM are not barred by the Eleventh Amendment and sovereign immunity; (2) SEAC did have jurisdiction to hear Employees' complaint pursuant to I.C. § 4–15–2–35; (3) SEAC substantially complied with the Open Door Law when it issued its final order; (4) Hearing Officer Riggs did not err by admitting Employees' Exhibit M into evidence, and SEAC did not err by relying upon Employees' Exhibit M; (5) SEAC's conclusion that Employees were discriminated on the basis of the age is supported by substantial evidence; and (6) SEAC acted properly in fashioning an appropriate remedy.

For the foregoing reason, we affirm the judgment of the trial court.

Affirmed.

DARDEN, J. and ROBB, J. concur.